# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| BOARD OF TRUSTEES OF THE PAINTERS AND FLOORCOVERERS JOINT COMMITTEE, *et al.*,<br><br>　　　　　　　Plaintiff,<br>　　vs.<br><br>SUPER STRUCTURES INC., *et al.*,<br><br>　　　　　　　Defendants. | Case No.: 2:18-cv-01364-GMN-EJY<br><br>**ORDER** |

Pending before the Court is the Motion for Summary Judgment, (ECF No. 44), filed by Defendants Super Structures, Inc. ("SS1") and Super Structures Inc. ("SS2"), Tracey Reynolds, Robert Reynolds, and Western National Mutual Insurance Company (collectively, "Defendants").  Plaintiffs Board of Trustees of the Painters and Floorcoverers Joint Committee, *et al.* (collectively, "Plaintiffs"), filed a Response, (ECF No. 52), and Defendants filed a Reply, (ECF No. 57).

Also Pending before the Court is Plaintiffs' Motion for Summary Judgment, (ECF No. 50).  Defendants filed a Response, (ECF No. 51), and Plaintiffs filed a Reply, (ECF No. 58).

Also pending before the Court is Plaintiffs' Motion to Strike, (ECF No. 59), regarding Defendants' Reply, (ECF No. 57), to Defendants' Motion for Summary Judgment, (ECF No. 44).  Defendants filed a Response, (ECF No. 60), and Plaintiffs filed a Reply, (ECF No. 61).

Also pending before the Court is Defendants' Motion for Leave to File Excess Pages, (ECF No. 56), regarding their Motion for Summary Judgment, (ECF No. 44).  Plaintiffs did not file a Response.

For the reasons discussed below, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment, **DENIES** Defendants' Motion for Summary Judgment, **DENIES as moot** Plaintiffs' Motion to Strike, and **DENIES as moot** Defendants' Motion for Leave to File Excess Pages.

## I.    BACKGROUND

This case arises out of Defendants' alleged creation of a sham company to avoid payment obligations under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA").  Defendant Super Structures, Inc. ("SS1") is a now-defunct Nevada corporation, formerly owned and operated by Defendants Tracey and Robert Reynolds. (Cert. Dissolution, Ex. 58 to Pls.' MSJ, ECF No. 50-60).  Defendant Super Structures Inc. ("SS2"), which is presently owned and operated by Tracey and Robert Reynolds, is a Nevada corporation that came into existence approximately eighteen months after SS1 dissolved. (Art. Inc., Ex. 59 To Pls.' MSJ, ECF No. 50-61).  Plaintiffs are several construction-related employee-benefit trusts and associations who bring this action seeking to hold SS2 and the Reynolds' liable for SS1's alleged unpaid ERISA contributions. (Compl. ¶¶ 5–7).

SS1 was incorporated on November 13, 2003, by Robert Reynolds, as President and Secretary, and non-party George Kelesis, as Treasurer, however Kelesis had no ownership interest in SS1. (Art. Inc., Ex. 1 to Pls.' MSJ, ECF No. 50-3); (Tracey Dep. 14:17–15:25, Ex. 5 to Pls.' MSJ, ECF No. 50-7).  On April 5, 2007, Robert transferred all of his interest in SS1 to Tracey, making Tracey the sole shareholder. (Dec. 2016 Minutes, Ex. 9 to Pl's MSJ, ECF No. 50-11).  SS1 used offices and a warehouse located at 6327 Dean Martin Drive and had a mailing address at 3395 S. Jones, #297, Las Vegas 89146. (Art. Inc., Ex. 1 to Pls.' MSJ); (Robert Dep. 72:10–11, Ex. EE to Defs.' MSJ, ECF No. 44-1).  SS1 primarily undertook multi-million-dollar construction projects on the Las Vegas Strip, and thus was required to use union workers. (Robert Dep. 28:16–17, Ex. EE to Defs.' MSJ); (Tracey Dep. 107:13–108:21, Ex. FF. to Defs.' MSJ, ECF No. 46).

On November 9, 2005, SS1 signed a collective bargaining agreement (the "CBA") with the International Union of Painters and Allied Trades, District Council 15, Painters Local 159 (the "Union") and the Painting and Decorating Contractors of America, Southern Nevada Chapter ("PDCA"). (CBA Signatures, Ex. 21 to Pls.' MSJ, ECF No. 50-23).  Under the terms of the CBA, SS1 was obligated to submit written reports stating the identities and hours worked of employees performing labor covered by the CBA and to pay fringe benefit contributions to Plaintiffs based on those hours. (*See* CBA, Ex. 20 to Pls.' MSJ, ECF No. 50-22).

The CBA states that its provisions remain in effect from July 1, 2004, through June 30, 2007. (*Id.*).  However, under the CBA's Duration Clause, the CBA renewed annually "unless written notice of desire to cancel or terminate the Agreement is served by either party upon the other not less than sixty (60) and not more than (90) days prior to June 30, 2007, or June 30 of any subsequent contract year." (*Id.* at 0026).  Notably, the CBA requires notice to the Union, not employee benefit funds.[1]  The CBA also includes a Preservation of Work Clause, which applies the CBA to other business entities owned, managed, or controlled by those who owned, managed, or controlled SS1.[2] (*Id.* at 0013).  In January of 2007, SS1 assigned its bargaining rights to PDCA, authorizing it to represent SS1 in labor negotiations with the Union under the CBA. (Assignment, Ex. 26 to Pls.' MSJ, ECF No. 50-28).

---

[1] The CBA is an agreement between the Union and the PDCA, on behalf of SS1. (*See* CBA at 0001, Ex. 20 to Pls.' MSJ, ECF No. 50-22).  The Duration Clause requires notice of intent to terminate by one party upon the other. (*Id.* at 0026).  Therefore, in order for SS1 to terminate the CBA, they must serve notice to the Union, the other party to the contract.

[2] The Preservation of Work clause states: "To protect and preserve, for the employees covered by this Agreement, all work they have performed and all work covered by this Agreement, and to prevent any devise or subterfuge to avoid the protection and preservation of such work, it is agreed as follows: If the Employer performs on site construction work of the type covered by this agreement, under its own name, the name of another, as a corporation, company, or partnership, or other business entities including a joint venture, wherein the Employer, through its officers, directors, partners, owners, or stockholders, exercises directly or indirectly (through family members or otherwise), management, control, or majority ownership, the terms and conditions of this agreement shall be applicable to all such work." (CBA at 0013, Ex. 20 to Pl.'s MSJ, ECF No. 50-22).

In June of 2009, the Reynolds decided to close their business because, despite their continued bidding, SS1 was not being awarded any projects. (Tracey Dep. 50:14–23, Ex. FF to Defs.' MSJ).  Additionally, the Reynolds' son suffered a severe work-place injury on June 26, 2009, further prompting them to end the business. (*Id.* 63:8–16).  On August 31, 2009, SS1 laid off its administrative staff. (*Id.* 65:12–18).  SS1 did not renew its lease on the Dean Martin property, and cleared out the office and warehouses, either giving away or storing company property, such as vehicles, construction tools, and office supplies. (Robert Dep. 71:25–76:7, Ex. EE to Defs.' MSJ).  On June 14, 2010, during a special meeting of stockholders and directors, SS1 formally decided to close its business and distribute its remaining assets to Tracey. (June 2010 Minutes, Ex. 49 to Pls.' MSJ, ECF No. 51).  SS1 filed its Certificate of Dissolution on October 31, 2011. (Cert. Dissolution, Ex. 58 to Pls.' MSJ).

On October 14, 2009, Tracey sent a letter to Martha Moore, the Administrative Manager for the Painters and Decorators Joint Committee (the "Joint Committee),[3] as notice that they were going out of business. (October Letter, Ex. 34 to Pls.' MSJ, ECF No. 50-36).  While "Local No. 159" was included in the address, Martha Moore worked for the Joint Committee, and was not employed by the Union. (*Id.*). (*See also* Pfundstein Dep. 25:15–20, 39:23–40:9, Ex. 24 to Pls.' MSJ, ECF No. 26).  The Union has no record of receiving the letter dated October 14, 2009. (Lamberth Decl. ¶ 8, ECF No. 50-2).  On March 30, 2012, Tracey sent a letter to Michelle Erdahl at the Employee Painter's Trust,[4] care of Zenith Administrators, stating that SS1 is "OUT OF BUSINESS." (March Letter, Ex. 37 to Pls.' MSJ, ECF No. 50-

---

[3] The Painters and Decorators Joint Committee is the predecessor in interest to Plaintiff Painters and Floorcoverers Joint Committee. (Pl.'s MSJ 8:21–25).  The Joint Committees is an employee benefit trust fund entitled to contributions from SS1 pursuant to the CBA, but it is a separate entity from the Union. (Pfundstein Dep. 39:23–40:9, Ex. 24 to Pl.'s MSJ, ECF No. 26).

[4] The Employer Painter's Trust is another Plaintiff trust fund to this action, but is also a separate entity from the Union. (Konys Dep. 42:10–25, Ex. 36 to Pl.'s MSJ, ECF No. 50-38).

39).  This letter was also sent to Martha Moore, as well as Tom Pfundstein at the PDCA.[5] (*Id.*).  The Union has no record of receiving the letter dated March 30, 2012. (Lamberth Decl. ¶ 8, ECF No. 50-2).

On May 27, 2013, Tracey Reynolds, along with non-party Carol Downing, filed Articles of Incorporation with the Nevada Secretary of State to establish an entity called Super Structures Inc. ("SS2"), identifying Tracey as President and Director and Downing as Secretary.[6] (Art. Inc., Ex. 59 To Pls.' MSJ, ECF No. 50-61).  In October of 2015, Downing resigned and sold her shares back to SS2, making Tracey the sole shareholder; Robert became Secretary. (Oct. 2015 Minutes, Ex. 63 to Pls.' MSJ, ECF No. 50-65); (Nov. 2015 Minutes, Ex. 64 to Pls.' MSJ, ECF No. 50-66).  SS2's office is located at 2600 South Rainbow, Unit 204, but uses the same mailing address as SS1. (Art. Inc., Ex. 59 To Pls.' MSJ); (Robert Dep. 80, Ex. EE to Defs.' MSJ).  SS2's work primarily consists of small, off-Strip, non-union jobs. (Robert Dep. 102:15, Ex. EE to Defs.' MSJ).  While Tracey contacted the Union about a CBA, SS2 ultimately decided not to be a signatory in order to compete with the other off-Strip, non-union contractors. (Tracey Dep. 103:1–112:15, Ex. 5 to Pls.' MSJ).  Plaintiffs now seek unpaid fringe benefits originally owed by SS1 from SS2. (*See generally* Pls.' MSJ, ECF No. 50).

## II.   <u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[5] The PDCA is also a separate entity from the Union. (Pfundstein Dep. 40:5–9, Ex. 24 to Pl.'s MSJ).

[6] The only difference in the entities' names is the removal of the comma between "Super Structures" and "Inc.," which was accidental. (Tracey Dep. 87:3–5, Ex. FF to Defs.' MSJ, ECF No. 46).

(1986).  A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *See id.*  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)).  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

1   If the moving party satisfies its initial burden, the burden then shifts to the opposing

2   party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v.*

3   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute,

4   the opposing party need not establish a material issue of fact conclusively in its favor.  It is

5   sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

6   parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

7   *Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  However, the nonmoving party "may not rely on

8   denials in the pleadings but must produce specific evidence, through affidavits or admissible

9   discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404,

10  1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical

11  doubt as to the material facts."  *Orr v. Bank of America*, 285 F.3d 764, 783 (9th Cir. 2002)

12  (internal citations omitted).  "The mere existence of a scintilla of evidence in support of the

13  plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.  In other words, the

14  nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations

15  that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

16  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set

17  forth specific facts by producing competent evidence that shows a genuine issue for trial. *See*

18  *Celotex Corp.*, 477 U.S. at 324.

19  At summary judgment, a court's function is not to weigh the evidence and determine the

20  truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

21  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn

22  in his favor." *Id*. at 255.  But if the evidence of the nonmoving party is merely colorable or is

23  not significantly probative, summary judgment may be granted. *See id*. at 249–50.

24

25

III.    **DISCUSSION**

Plaintiffs allege that since August 1, 2009, SS1 has not submitted any remittance reports or tendered payment to Plaintiffs for their work. (*See generally* Compl., ECF No. 1).  Plaintiffs filed their Complaint on June 24, 2018, bringing the following causes of action: (1) breach of contract against all Defendants; (2) violation of ERISA against all Defendants; (3) personal liability against Tracey and Robert Reynolds; (4) demand for relief on bond against Western National Mutual Insurance Company; and (5) payment of labor indebtedness against Doe and Roe Defendants. (*Id.*).

In their Motion for Summary Judgment, Plaintiffs seek a declaratory judgment that the CBA is still in effect and SS2 is either bound by the Preservation of Work clause or as the alter ego of SS1. (*See generally* Pls.' MSJ, ECF No. 50).  Plaintiffs also seek damages[7] in the amount of $188,448.47, plus fees and costs, for SS2's failure to remit fringe benefit contributions pursuant to the CBA, trust agreements, and ERISA.[8] (Pls.' MSJ 2:9 –13, 20:21– 22, 26:4–5, ECF No. 50).  In contrast, Defendants claim not only that the CBA is no longer in effect, but also that SS2 is not the alter ego of SS1. (Defs.' MSJ, 1:6–24, ECF No. 44).  Additionally, Defendants assert a defense of laches. (*Id.* 29:11–30:4).

### A. Defendants' Laches Defense

As an initial matter, Defendants assert that Plaintiffs' claim is barred by laches, alleging that because Plaintiffs did not bring this suit until 2018, Defendants were prejudiced and have been prevented from substantially defending this case. (*Id.*).  Plaintiffs seek to strike a portion

---

[7] The Court groups its discussion of Plaintiffs' claims for damages.  Here, breach of the CBA and ERISA each authorize the same claim to unpaid fringe benefit contributions. *See Laborers Clean -Up Contract Admin. Trust Fund v. Uriarte Clean-Up Service, Inc.*, 736 F.2d 516 (9th Cir. 1984).  Any distinction between the claims is not relevant to the Court's summary judgment analysis.

[8] "The Plaintiffs have not moved for summary judgment against Tracey Reynolds, Robert Reynolds, or Western National Mutual Insurance Company in this Motion [sic]." (Pls.' MSJ 2:26–27, ECF No, 50).

of Defendants' laches defense because evidence has been introduced in violation of Federal Rule of Civil Procedure 26(a)(1)(A)(ii).[9] (Mot. Strike 14:14–16).

The doctrine of laches applies "to claims of an equitable cast for which the Legislature has provided no fixed time limitation." *Petrella v. Metro-Goldwyn-Mayer, Inc.,* 134 S. Ct. 1962, 1973 (2014). Laches is an affirmative defense listed with, but discrete from, the statute of limitations under the Federal Rule of Civil Procedure 8(c). *See id.* at 1974. Further, observing that laches "may have originated in equity because no statute of limitations applied," the Supreme Court has held "that laches should be limited to cases in which no statute of limitations applies." *Id.* at 1973.

"In ERISA actions, federal courts employ a state statute of limitations*." N. California Retail Clerks Unions & Food Employers Joint Pension Trust Fund v. Jumbo Markets, Inc.*, 906 F.2d 1371, 1372 (9th Cir.1990). Specifically, courts apply the state statute of limitations for bringing contract actions, which in Nevada, is six years. *See, e.g.*, *Feikes v. Cardiovascular Surgery Associates Profit Sharing Plan, Trust*, No. 2:04-cv-1724-LDG-GWF, 2013 WL 6205424, at *5 (D. Nev. Nov. 26, 2013) (citing *Flanagan v. Inland Empire Elec. Workers' Pension Plan & Trust*, 2 F.3d 1246, 1247 (9th Cir. 1993); NRS § 11.190(1)(b). Therefore, Defendants' laches claim is inapplicable.[10] Because Defendant's laches claim is inapplicable as a matter of law, and the allegations in support thereof are irrelevant, the Court denies as moot Plaintiffs' Motion to Strike.

//

//

---

[9] Rule 26(a)(1)(A)(ii) requires parties to disclose "a copy–or a description by category and location–of all documents . . . that the disclosing party . . . may use to support its claims or defenses."

[10] Moreover, Plaintiffs brought their claim well-within the appropriate statute of limitations. On July 24, 2018, Plaintiffs filed their Complaint alleging that SS2 avoided its ERISA obligations. (*See* Compl. 23:14). However, SS2 was not even created until May 27, 2013, which is less than six years before Plaintiffs brought this case. (*See* Art. Inc., Ex. 59 To Pls.' MSJ).

1

### B.  Termination of the CBA

Plaintiffs may bring a cause of action under ERISA to enforce terms in a collectively

bargained agreement that require an employer to make contributions to a multiemployer plan.

29 U.S.C. § 1145; *Trustees of Screen Actors Guild-Producers Pension Health Plans v. NYCA, Inc.*, 572 F.3d 771, 776 (9th Cir. 2009) ("In our view, § 1145 imposes no independent

obligation upon employers; it merely provides a federal cause of action to enforce pre-existing

obligations created by collective bargaining agreements.").  "[Courts] interpret collective

bargaining agreements, including those establishing ERISA plans, according to ordinary

principles of contract law." *M&G Polymers USA LLC v. Tackett*, 574 U.S.427, 435 (2015).

In the Ninth Circuit, courts must strictly construe the terms of a collective bargaining

agreement, as long as those terms are clear and unambiguous. *Irwin v. Carpenters Health and Welfare Trust Funds for California*, 745 F.2d 553, 557 (9th Cir. 1984).  Even terms

automatically renewing a CBA are enforceable if they are sufficiently definite. *Id.*

For example, in *Irwin*, the Ninth Circuit found that a clause in the CBA establishing a

sixty-day notice requirement for terminating the automatic renewal term of the CBA was

specific and "narrowly tailored." *Id.* at 556.[11]  Because the CBA clearly and unambiguously

stated a notice period, when the employer gave notice outside of that period, the Court found

that neither the CBA nor its renewal period had terminated. *Id.* at 556–57.

In the present case, the CBA requires written notice of a desire to terminate the CBA not

less than sixty days, but not more than ninety days, before June 30th annually. (CBA, Ex. 20 to

Pls.' MSJ).  This termination clause is similar to the clause at issue in *Irwin* because it specifies

the exclusive period in which a party may give notice to terminate the CBA. *See Irwin*, 745

_____

[11] The clause at issue in *Irwin* stated: "The Agreement shall remain in full force and effect from the 15th day of June, 1971, through the 15th day in June, 1974, and shall continue thereafter [sic] unless either party within sixty (60) days prior to the 15th day of June, 1974, or sixty (60) days prior to the 15th day of June of any subsequent year serves written notice on the other of its desire to change, modify, amend or supplement is Agreement." *Irwin v. Carpenters Health and Welfare Trust Funds for California*, 745 F.2d 553, 556 (9th Cir. 1984).

F.2d at 556.  As such, the Court finds it to be clear and unambiguous that in order to

successfully terminate the CBA, SS1 needed to serve the Union with notice between sixty and

ninety days before June 30th.  Plaintiffs argue that Defendants did not serve notice upon the

Union within the prescribed time period, and actually, never served the Union with notice at

any time. (*See generally* Pls.' MSJ, ECF No. 50); (Lamberth Decl. ¶ 8) ("I have searched the

Union's records and I am not aware of any notice of termination from Super Structures. I am

informed that the Defendants have produced letters in this case dated October 14, 2009 and

March 30, 2010. The Union has no record of ever receiving either letter.").  Strictly construing

the CBA's unambiguous Duration Clause, the Court agrees.

Defendants have provided no evidence that they served the Union with written notice of

SS1's desire to terminate the CBA between sixty and ninety days before June 30th of any year.

Defendants only present evidence of two written notices: (1) a letter sent on October 14, 2009,

addressed to the Joint Committee and the Union to the attention of Martha Moore; (2) a letter

sent on March 30, 2010, which was addressed to the Employer Painter's Trust,[12] the PDCA,

and the Union to the attention of Martha Moore.[13] (October Letter, Ex. 34 to Pls.' MSJ);

(March Letter, Ex. 37 to Pls.' MSJ).  However, the evidence indicates that Martha Moore is not

a Union employee; she works for the Joint Committee, which is a separate entity from the

---

[12] The letter was addressed to the Employer Painter's Trust to the attention of Michelle Erdahl, care of Zenith Administrators. (March Letter, Ex. 37 to Pl.'s MSJ, ECF No. 50-39).

[13] Defendants claim to have also sent a letter notifying the Union that they were going out of business on September 2, 2009. (Pl.'s MSJ 5:6–7). However, Defendants provide no evidence of this letter.  The only other written correspondence provided by Defendants, again addressed to both the Joint Committee and the Union, does not include a date and is attached to an email that Tracey sent on April 16, 2018. (Letter, Ex. MM to Defs.' MSJ, ECF No. 49-3).  However, even assuming that this dateless letter was the one from September 2, 2009, it still does not constitute proper notice because it was sent well more than ninety days prior to June 30th. Similarly, Defendants claim that Tracey notified PDCA employee Tom Pfundstein of SS1's closure through a phone conversation on October 20, 2009. (Defs.' MSJ 17: 4–7).  However, not only was this call not written notice as required by the CBA, but Pfundstein does not work for the Union, and the date of the call was far more than ninety days before the termination period. (Pfundstein Dep. 40:5–9, Ex. 24 to Pl.'s MSJ).

Union. (*See* October Letter, Ex. 34 to Pls.' MSJ); (Pfundstein Dep. 25:15–17, 39:23–40:9, Ex. 24 to Pls.' MSJ).  Similarly, the Employer Painter's Trust and PDCA are also separate entities from the Union. (Pfundstein Dep. 40:5–9, Ex. 24 to Pls.' MSJ).  As a result, a letter received by Martha Moore, the PDCA, or the Employer Painter's Trust would not constitute receipt by the Union.  Therefore, there is no evidence that the Union received either of these letters, and in fact, the Union denies ever receiving a letter from SS1 dated October 14, 2009, or March 30, 2010. (*See* Lamberth Decl. ¶ 8, Pls.' MSJ).  Further, even if the Union received one of the letters, it would still not constitute proper notice, because neither letter was sent within the correct time period; both letters are dated more than ninety days from June 30th.[14]

Defendants argue that under the holding of *Carpenter's S. Cal. Admin. Corp. v. Russell*, 726 F.2d 1410 (9th Cir. 1983), SS1 successfully terminated the CBA.  In *Russell*, the employer failed to provide written notice within the correct time period to cancel his union contract. *Id.* at 1412.  Instead, the employer notified the union that his company was going out of business during an in-person meeting with union representatives, which the union recorded. *Id.*  In this limited circumstance, the Ninth Circuit found that that the employer successfully terminated the CBA when the business dissolved. *Id.* at 1414.

While *Russell* presents an exception to *Irwin*'s mandate of strictly interpreting the clear terms in a CBA, it is a narrow one, limited to the specific facts in *Russell*.  For example, central to the Court's decision in *Russell* was the fact that the employer still notified the union directly, albeit orally, and the union preserved a written record of that notice. *Id.* at 1414.  However, the determinative facts in *Russell* do not mirror the present case.  Most notably, there is no evidence that the Union was ever directly notified, orally or in writing, of SS1's desire to terminate the CBA.  Likewise, the Union has no written record of its own concerning SS1's

---

[14] Defendants argue that the March 30, 2010, letter arrived in April of 2010, which is within the notice period established in the CBA.  However, Defendants provide no evidence of when the letter was received, or by whom. (Pl.'s MSJ 16:20–21).

1    decision to go out of business.  Thus, the narrow exception in *Russell* does not apply.  Instead,

2    the Court strictly construes the clear and unambiguous terms in the CBA.  Accordingly, the

3    Court finds that Plaintiffs have met their burden to show that the CBA is still in effect because

4    Defendants failed to create a genuine issue of material fact as to whether it was terminated.

5            Included in the CBA is the Preservation of Work Clause, which Plaintiffs argue imposes

6    the obligations in the CBA on SS2. (Pls.' MSJ 24:21–22).  In the Ninth Circuit, courts enforce

7    preservation of work clauses. *Building Materials and Construction Teamsters Local No. 216 v.*

8    *Granite Rock Co.*, 851 F.2d 1190, 1197 (9th Cir. 1988).  In this case, the Preservation of Work

9    Clause applies the CBA to other businesses owned, operated, or managed by the owners,

10   operators, or managers of SS1, as long as that other business performs the type of work covered

11   by the CBA.  The CBA covers painting, wall covering, drywall finishing, paint making, sign

12   and display, scenic art and design, and metal polishing work in the Nevada counties of Clark,

13   Lincoln, Nye, and Esmerelda. (CBA at 2–6, Ex. 20 to Pls.' MSJ).  SS1 and SS2 both perform

14   the type of work described in the CBA.[15] (*See, e.g.*, Robert Dep. 37:1–5, 89:15–17, Ex. EE to

15   Defs.' MSJ (indicating both SS1 and SS2 did dry-wall work)).

16           Additionally, because SS1 and SS2 are both owned, operated, and managed by Tracey

17   and Robert Reynolds, the Preservation of Work Clause binds SS2 to the CBA.[16] *See also Board*

18   *of Trustees of Glazing Health and Welfare Fund v. Z-Glass, Inc.*, No. 2:17-cv-01638-JAD-

19   NJK, 2020 WL 4004798, at *6 (D. Nev. July 15, 2020). (finding that where Z-Glass and ZSW

20   shared owners and Z-Glass signed a CBA, but went out of business, ZSW was still bound by

21

22
     _____

23   [15] Defendants contend that SS2 performs qualitatively different work than SS1, citing differences in price point,
     location, and union participation, but never claim that SS2's work is outside the scope of the CBA. (*See* Defs.'
     Reply 3:9–4:10, ECF No. 57).

24
     [16] The parties do not dispute that SS1 and SS2 had common ownership and management; the parties dispute
25   whether SS1 and SS2 had interrelated operations, which has implications for alter ego analysis, but not for
     whether the Preservation of Work Clause applies. (*See* Defs.' Reply 2:11–15).

the CBA through the work preservation clause).  Finally, Defendants do not contest Plaintiffs'

argument that the Preservation of Work Clause binds SS2 to the CBA.[17]  Accordingly, the

Court finds that there is no genuine dispute of material fact that the CBA remains in effect and

grants summary judgment in favor of Plaintiffs regarding its request for a declaration that SS2

is bound by the CBA.[18]

        In addition to a declaratory judgment, Plaintiffs also ask the Court to award damages for

SS2's unpaid fringe benefit contributions, the associated interest, and liquidated damages.[19]

(Pls.' MSJ 30:12–16).  Plaintiffs retained Berry & Co. CPA's, Ltd. ("Berry & Co.") to conduct

a payroll compliance audit of SS2, spanning from April 1, 2012, through November 30, 2018.[20]

(*See generally* Decl. David Berry ¶ 7, ECF No. 50-1).  Berry & Co. completed the audit based

on documents provided by SS2 during discovery[21] that showed hours worked by SS2

employees doing labor covered by the CBA.  (*Id.* ¶ 6).  Accordingly, Plaintiffs submitted audit

schedules for SS2 demonstrating delinquent fringe benefit contributions, interest, and

liquidated damages.  (*See* Audit Schedule, Ex. 70 to Pls.' MSJ, ECF No. 50-72).  The audit

---

[17] Defendants only claim that the CBA as a whole had been terminated, and thus does not apply; Defendants did not present an argument concerning the applicability of any specific clauses should the CBA remain in force.

[18] The Court need not determine if SS2 is bound to the CBA because it is SS1's alter ego, because SS2 is already bound to the CBA under the Preservation of Work Clause.

[19] The CBA states: "Employers failing to submit monthly reports as provided for above [sic] shall be assessed liquidated damages equal to five percent (5%) of the amount due on a monthly basis." (CBA at 0012, Ex. 20 to Pls.' MSJ).  Further, 29 U.S.C. § 1132(g)(2), orders the court to award the unpaid contributions, interest on the unpaid contributions, and liquidated damages under the CBA when a fiduciary brings an action for or on behalf of an ERISA plan under 29 U.S.C. § 1145.

[20] The damages calculation represents the damages sustained during the time-period covered by the audit.

[21] "Through discovery the Plaintiffs obtained the following records from Super Structures, which were then provided to Berry & Co. for the purpose of completing the Audit: Job Ledger Report for the Period May 1, 2013, through November 30, 2018 (printed 12/4/18) (DEFENDANTS0938-1113); Job Ledger Report From May 1, 2013, through November 30, 2018 (printed 2/7/19) (DEFENDANTS2985-3459); SS1 Employee List (DEFENDANTS 141-1161); SS2 Employee List (DEFENDANTS1 162-1164); SS2 Cost Code List (DEFENDANTS 1165-1167); SS2 Job Ledger Reports and SS2 Payroll Journals with Job Info 2013-2018 (DEFENDANTS1 165-1743)." (Decl. David Berry ¶ 6, ECF No. 50-1).

schedule identifies $132,096.59 in delinquent fringe benefit contributions, $24,652.86 in interest, and $31,699.02 in liquidated damages for a total damages claim of $188,448.47. (Audit Schedule, Ex. 70 to Pls.' MSJ); (Decl. David Berry ¶ 7).  Defendants failed to contest these amounts in their Response to Plaintiffs' Motion for Summary Judgment.  As such, the Court finds that Plaintiffs have met their burden to show the amount of recoverable damages in issue and grants summary judgment in favor of Plaintiffs for the demonstrated unpaid fringe benefit contributions, interest, and liquidated damages in the amount of $188,448.47.

**IV.    CONCLUSION**

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment, (ECF No. 50), is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment, (ECF No. 44), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike, (ECF No. 59), is **DENIED as moot.**

**IT IS FURTHER ORDERED** that Defendants' Motion for Leave to File Excess Pages, (ECF No. 56), is **DENIED as moot**.

**IT IS FURTHER ORDERED** that within twenty-one days of the entry of this Order Plaintiffs shall file a Status Report explaining the pendency of its remaining claims.  If Plaintiffs intend to pursue its claims against Tracey Reynolds, Robert Reynolds, and Western National Mutual Insurance Company, then the parties shall file a Proposed Joint Pretrial Order within thirty days of the entry of this Order.

**DATED** this __30__ day of November, 2020.

_____
Gloria M. Navarro, District Judge
United States District Court